UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

AMIN B. BOOKER,

                                        Plaintiff,

        vs.

                                                            9:06-CV-73
JOHN DOE (Medical Provider # 261); JOHN DOE            (GLS)
(Medical Provider # 123); DR. PANG L. KOOI;
VIRGINIA ANDROSKO; BILL ROBERTSON;
LESTER WRIGHT,
                                        Defendants.

_____

AMIN B. BOOKER, Plaintiff *Pro Se*
ADRIENNE J. KERWIN, Assistant Attorney General for Defendants

GARY L. SHARPE, United States District Judge

### MEMORANDUM DECISION AND ORDER

        In this civil rights complaint, plaintiff, an inmate in the custody of the

New York Department of Correctional Services ("DOCS"), alleges that

employees of DOCS were deliberately indifferent to his serious medical

need for treatment for his left shoulder. Complaint (Compl.)(Dkt. No. 1).

Plaintiff seeks substantial monetary relief.

        Presently before the court[1] is defendants' motion for summary

judgment pursuant to FED. R. CIV. P. 56. (Dkt. No. 39).  Plaintiff opposes

_____

        [1] The parties are advised that the referral to a Magistrate Judge as provided for under
Local Rule 72.3 has been rescinded for purposes of this motion, and as such, any appeal taken
from this order will be to the Court of Appeals for the Second Circuit.

defendants' motion. (Dkt. No. 43).  For the following reasons, this court will

grant defendants' motion, and will dismiss the action *sua sponte* as to the

two John Doe defendants and defendant Robertson.

### DISCUSSION

1.   <u>**Summary Judgment**</u>

Summary judgment may be granted when the moving party carries its

burden of showing the absence of a genuine issue of material fact.  FED. R.

CIV. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations

omitted).  "Ambiguities or inferences to be drawn from the facts must be

viewed in the light most favorable to the party opposing the summary

judgment motion." *Id.*  However, when the moving party has met its burden,

the nonmoving party must do more than "simply show that there is some

metaphysical doubt as to the material facts."  *Matsushita Electric Industrial

Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). *See also

Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

At that point, the nonmoving party must move forward with specific

facts showing that there is a genuine issue for trial.  *Id.*  A dispute about a

genuine issue of material fact exists if the evidence is such that "a

reasonable [factfinder] could return a verdict for the nonmoving party."

*Anderson*, 477 U.S. at 248.  In determining whether there is a genuine

2

issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

## 2.   Facts

Plaintiff is currently incarcerated at Green Haven Correctional Facility.  Plaintiff testified at his deposition[2] that his shoulder problems began in 1994 while he was incarcerated at Greene Correctional Facility. Def. Ex. A (Deposition Transcript (T.) at 7-8)(Dkt. No. 39).  Plaintiff stated that he fell out of a window, and tried to break his fall with his arm. (T. at 8). Plaintiff testified that he did not begin seeking medical treatment for his shoulder until 1998.[3] (T. at 10-11).

Plaintiff states that on January 25, 2002 and on February 4, 2002,

---

[2] Plaintiff was deposed on October 12, 2007. Def. Ex. A.

[3] Although not relevant to this decision because plaintiff has not named any medical personnel that examined him prior to 2002, the court notes that plaintiff first testified at his deposition that between the time of his injury in 1994 and 1998, he did not ask anyone to look at his shoulder, but then stated that he requested treatment for the pain, but the medical personnel never gave him anything. (T. 10-12).  Plaintiff also testified that he was incarcerated throughout this time. (T. 11).  The court notes, however, that it appears that plaintiff was *not* incarcerated between February 23, 1996 when he was released on parole from his 1994 incarceration until October 28, 1998, when he was returned on a parole violation which included four new criminal charges.  Plaintiff's current DIN number is 98-A-6245, which would indicate that he was received into DOCS in 1998.  Thus, In order for him to have been incarcerated in 1994, there would have had to have been a prior incarceration.  The DOCS website confirms this. http://www.docs.state.ny.us  Plaintiff's prior DIN number was 94-R-8535.  Unless there is another Amin Booker with the same birth date, these two records appear to be the same individual.  Thus, it is unclear why plaintiff testified that he was incarcerated for the entire time between 1994 and 1998.

while he was incarcerated at Attica Correctional Facility in Attica, New

York, he was examined by two defendant "John Doe" medical providers.[4]

Compl. ¶¶ 14-18.   Plaintiff states that on each of these dates, he

complained about his shoulder.  Plaintiff claims that the first John Doe

asked plaintiff to raise his arm, and when plaintiff complied, told him that

the shoulder was not dislocated. Compl. ¶ 15.  The second "John Doe"

allegedly ordered an x-ray of plaintiff's shoulder, but told plaintiff there was

nothing wrong. Compl. ¶ 17. Plaintiff claims that when he asked if there

was any way to stop the problem that he was having with his shoulder,

John Doe # 2 told plaintiff that he would get back to him if there was

anything that could be done. Compl. ¶ 18.  Plaintiff claims that John Doe #

2 also told plaintiff not to sign up for sick call about "this" or he would be

issued a misbehavior report. *Id.*

       Defendants have submitted excerpts from plaintiff's Ambulatory

---

[4] Plaintiff identifies these "John Doe" defendants by their Provider Numbers,      # 261 and #123. Compl. ¶¶ 14, 16.  At his deposition on October 12, 2007, plaintiff testified that in the time since he prepared the complaint, he learned the names of Medical Providers ## 261 and 123. (T. at 16-17).  Plaintiff states that Medical Provider 261 is Norman Dworzeck and Medical Provider 123 is Jose Deprivio. *Id.*  Plaintiff has never sought leave to amend his complaint, and the two "John Does" remain as unnamed defendants.  As will be discussed below, the complaint may be dismissed as against these individuals in any event, thus, plaintiff's failure to amend his complaint is irrelevant.

4

Health Record[5] ("AHR"). Def. Ex. B.  The AHR entry for January 25, 2002

shows that plaintiff complained to a medical professional that plaintiff

dislocated his shoulder the week before. (AHR at Jan. 25, 2002).   The

notation by the examiner states that plaintiff complained that he had been

unable to "pick up [his] arm," but that he eventually "worked it back into

place." *Id*.  Plaintiff also told the examiner that this had been happening for

a long time. *Id*.

The examiner's note states that he observed that plaintiff could move

his left arm freely, and could lift his arm over his head. *Id*.  The January 25,

2002 note states that plaintiff's shoulders were "symmetrical," and that

plaintiff was not in pain at the time of the visit. *Id*.  The note states "DR

callout." *Id*.  The examiner's handwriting is unclear with respect to his[6]

name and provider number. *Id*.

_____

[5]Plaintiff's Ambulatory Health Record, submitted by defendants, is located at Docket Number 39, Exhibit B.  Defendants have "traditionally" filed plaintiff's health records, including a number of documents and forms that are not Ambulatory Health Record forms that are interspersed within the actual Ambulatory Health Records.  All of the documents are in reverse chronological order, with the most recent documents appearing first.  Where the court can cite to a dated entry in the Ambulatory Health Record, the court will use the form "AHR at [date]".  The court has additionally hand-numbered the 67 pages of Exhibit B so that it may cite to the numerous documents interspersed within the Ambulatory Health Records.  In those instances, the court will use the form "Defs. Ex. B at [page]".

In addition to the traditionally filed motion, defendants provided the court with a compact disc that stores electronic versions of all of the documents related to the summary judgment motion.  The electronic version of the documents did not include page numbers for Exhibit B..

[6] Plaintiff has implied by calling these individuals "John" Doe, that they were both male.

5

On February 4, 2002, the AHR shows that plaintiff complained of pain in his shoulder, and stated that he had a history of dislocation.  (AHR at Feb. 4, 2002).  The examiner's handwriting is unclear for most of the entry.  *Id.*  It appears that plaintiff was still experiencing some tenderness at the time of the medical visit.  *Id.*  The examiner wrote "-xray left shoulder".  *Id.*

On February 4, 2002, Wyoming Valley Radiologists, P.C. performed an x-ray on plaintiff's left shoulder.  A "Report for Department of Correctional Services - Attica Facility" by C.J. Riggio, M.D. states "[f]ilms of the left shoulder with internal and external rotation show a one centimeter calcification in soft tissues just inferior to the region of the surgical neck of the humerus.  The bony architecture otherwise appears normal." Def. Ex. B at p. 66.

The medical records do not contain any other complaints about, or treatments for plaintiff's left shoulder until August 2003.  Between February 2002 and August 2003, plaintiff's medical records show that plaintiff was moved to two other DOCS facilities.  Plaintiff testified at his deposition that he arrived at Auburn sometime in March or April of 2003. (T. at 20).  An AHR entry dated March 6, 2003, shows "Upstate" in the box where the current facility is entered, but has a stamp with the word "incoming" circled and a handwritten notation "Auburn chart."  (AHR at Mar. 6, 2003).

6

The AHR shows that plaintiff's first complaint after arriving at Auburn Correctional Facility regarding his left shoulder occurred on August 11, 2003.  (AHR at Aug. 11, 2003).  On August 11, 2003, Registered Nurse ("RN") A. Vega wrote that plaintiff requested a doctor's appointment because his ears were plugged and he had pain in his left rotator cuff.  RN Vega wrote that she scheduled an appointment with Dr. Kooi.  On August 22, 2003, the AHR shows that plaintiff again complained about pain in his left rotator cuff and "clicking."  (AHR at Aug. 22, 2003).  RN S. Lennox noted "appt already scheduled with Dr. Kooi." *Id.*

The AHR shows that plaintiff's next complaint about his shoulder was on September 5, 2003 when he complained of "L shoulder - rotator cuff." (AHR at Sept. 5, 2003).  RN Lennox wrote that plaintiff "[h]as appt [with] Dr. Kooi scheduled".  *Id.*  On September 6, 2003, the AHR shows that plaintiff was in a fight and had a "Head to toe assessment.  (AHR at Sept. 6, 2003). RN D. Cayle noted that "No injury" was present.  *Id.*  Plaintiff was admitted to the Special Housing Unit ("SHU") on September 11, 2003, and the AHR shows that plaintiff did not have any health complaints at that time.  (AHR at Sept. 11, 2003).  Plaintiff was seen six times between September 11, 2003 and November 20, 2003, when he next complained about his left shoulder.  (*See* AHR at Sept. 12, 15, 19, and Oct. 6, 19, 18, 2003).

7

Although plaintiff includes the above information in his complaint, he does not name as defendants any of the individuals who examined him at Auburn between August 11, 2003 and November 20, 2003, when he was examined by defendant Androsko. Compl. ¶¶ 19-22.  The AHR shows that on November 20, 2003, plaintiff complained that his left shoulder "slips out of joint" and requested to see a doctor.  (AHR at Nov. 20, 2003). Defendant RN Androsko stated that this was an "old problem per inmate." *Id.*  It appears that this was plaintiff's first interaction with RN Androsko. Plaintiff also complained about some acne.  *Id.*  RN Androsko noted "PA Laux list." *Id.*

In the complaint, plaintiff claims that on December 3, 2003, Dr. Kooi told plaintiff that his shoulder "looked alright, he just needed to exercise more." Compl. ¶ 27.  Plaintiff also claims that Dr. Kooi looked at plaintiff's February 4, 2002 x-rays and told plaintiff that he just had a slight "tissue calcification." Compl. ¶ 28.  Plaintiff claims that Dr. Kooi finally agreed to "take another x-ray" after plaintiff continued to complain. Compl. ¶ 29.

Plaintiff's AHR shows that defendant Dr. Kooi examined plaintiff's left shoulder on December 3, 2003. (AHR at Dec. 3, 2003).  The entry states that plaintiff told Dr. Kooi that his left shoulder "comes out." *Id.*  In the "objective" section of the AHR form, Dr. Kooi wrote "ROM N." *Id.*  In his

8

declaration, Dr. Kooi states that this notation indicates that he found plaintiff's range of motion was normal. Kooi Decl. ¶ 10.  Dr. Kooi states that "[e]ven though plaintiff's physical examination was negative for dislocation, I ordered an x-ray of the plaintiff's left shoulder and directed the plaintiff [to] perform exercises designed to strengthen his shoulder." *Id.*

Plaintiff alleges in the complaint that he was examined by defendant Androsko on December 23, 2003, and that when he complained that his shoulder had dislocated several times and that he was in "excruciating pain," she called him a "Big Baby," and told him that no one wanted to hear about his shoulder. Compl. ¶¶ 30-32.  Plaintiff claims that defendant Androsko was rude to him and stated that if he wanted "luxury treatment, he shouldn't be in jail," and that she would personally see to it that it would be another month before he would get his x-ray. Compl. ¶¶ 30-34.

RN Androsko's entry in the AHR for December 23, 2003 states that plaintiff asked when the x-rays would be performed. (AHR at Dec. 23, 2003).  RN Androsko wrote "Inmate wants x-ray done immediately - also claims hasn't seen MD - saw MD 12/3." *Id.*  RN Androsko also wrote that she told plaintiff that the x-ray order was written, and the "x-ray will be done when tech has it scheduled." *Id.*

In his complaint, plaintiff alleges that on January 2, 2004, he told

9

defendant Androsko that he was in excruciating pain, but that she "taunted" plaintiff about his "whining." Compl. ¶ 37.  However, plaintiff states that defendant Androsko put plaintiff on the list to see the doctor. Compl. ¶ 38. The AHR entry for January 2, 2004, states that plaintiff complained of shoulder pain, and stated that his shoulder kept "dislocating & re-locating by itself."  (AHR at Jan. 2, 2004).  Defendant Androsko's entry states that plaintiff requested to see a doctor, and defendant Androsko put plaintiff on the list for "Dr. K." *Id.*

Plaintiff states that his shoulder was x-rayed on January 20, 2004, however, no treatment was prescribed. Compl. ¶ 39.  The plaintiff's medical records show that on January 20, 2004, St. Lawrence Radiology, P.C. performed an x-ray of plaintiff's left shoulder.  Defs. Ex. B at p.44.  The radiologist's report stated

> Benign appearing bone density seen projecting in the soft tissue consistent with a chronic origin.  No other significant bony pathology is seen.  The bone density projects just medial and posterior to the humeral neck.

*Id.*

Although plaintiff claims in the complaint not to have seen Dr. Kooi again until May 3, 2004, the records show that plaintiff saw Dr. Kooi on February 2, 2004. (AHR at Feb. 2, 2004).  Plaintiff told Dr. Kooi that

10

plaintiff's shoulder had dislocated on many occasions. *Id.* Dr. Kooi examined plaintiff and found a normal range of motion with no laxity. (AHR at Feb. 2, 2004; Dkt. No. 39, Kooi Decl. at ¶ 12). Dr. Kooi ordered shoulder exercises and a follow up appointment in three months "to evaluate the outcome of the exercise regime." Kooi Decl at ¶ 12; AHR at Feb. 2, 2004.

In the complaint, plaintiff alleges that on March 16, 2004, a nurse named "Greg" examined plaintiff and read his "February 4, 2002" x-ray results. Compl. ¶¶ 40-41. Plaintiff claims that "Greg" told plaintiff that he would need an MRI to identify why his shoulder was dislocating. Compl. ¶ 41. Plaintiff states that "Greg" put plaintiff on the list to see Dr. Kooi on March 16 and later on March 30, 2004. Compl. ¶¶ 43, 45.

The AHR also shows, however, that plaintiff was examined on March 3, 2004, when he complained about his left shoulder. (AHR at Mar. 3, 2004). The nurse noted that plaintiff "Has appt on 5/3 but req to move up." *Id.* Plaintiff again complained to the same nurse about his shoulder on March 16 and March 30, 2004. (AHR at Mar. 16 & 30, 2004). Plaintiff complained about pain in his shoulder to RN Vega on April 12, 2004 and again on April 27, 2004. (AHR April 12 & 27, 2004). On April 12, 2004, plaintiff requested an appointment with an orthopedist. (AHR at Apr. 12, 2004). On April 27, 2004, RN Vega wrote that she explained the procedure

11

about waiting lists for doctors.  (AHR at Apr. 27, 2004).

Plaintiff states that he saw Dr. Kooi May 4, 2004. Compl. ¶ 46.  The AHR indicates that the appointment was actually on May 3, 2004. (AHR at May 4, 2004).  In the complaint, plaintiff alleges that Dr. Kooi asked plaintiff to raise his left arm, and when he "complied," Dr. Kooi told plaintiff that there was nothing that he could do for him. Compl. ¶ 47.  Plaintiff states that he told Dr. Kooi that "several" registered nurses had explained to plaintiff that it was "their professional judgment" that plaintiff should have an MRI and see a specialist. Compl. ¶¶ 48.

Plaintiff also claims that Dr. Kooi never looked at the x-rays, he merely stated that the nurses did not know what they were talking about and refused to order an MRI and a consultation by an orthopedic specialist. Compl. ¶¶ 49-51.  Instead, plaintiff claims that Dr. Kooi told plaintiff that he would give plaintiff some pills that would "cure" him. Compl. ¶ 52.  The AHR note for May 4, 2004 is short and difficult to read, however, Dr. Kooi states in his declaration that plaintiff "indicated that he had experienced pain in his left shoulder off and on for approximately eight years.  On examination, plaintiff had normal range of motion in his left shoulder.  I ordered the plaintiff a prescription for Motrin."  Kooi Decl. at ¶ 13.

Plaintiff claims that on May 5, 2004, his shoulder dislocated again,

12

and he filed a grievance. Compl. ¶ 53.  Plaintiff states that in his grievance, he asked to be assigned a different doctor and that Dr. Kooi be "investigated and penalized for his actions." Compl. ¶ 54.  Plaintiff states that after a hearing on his grievance, he was told that nurses do not order or interpret x-rays, and that the committee could not instruct the medical department on specific courses of treatment. Compl. ¶ 56.

Plaintiff states that he was told that he needed to write to Dr. Kooi to request a different medical provider and that plaintiff could address his complaints to Dr. Lester Wright, Associate Commissioner of Health Services. Compl. ¶ 57.  Plaintiff states that he wrote to Dr. Wright on May 18, 2004, detailing the problems with plaintiff's shoulder and asking Dr. Wright to "address the problem professionally." Compl. ¶ 58.  Plaintiff claims that he also wrote to defendant Kooi again. Compl. ¶ 59.  Plaintiff also alleges that he complained to Nurse Administrator defendant William Robertson, who promised to speak with Dr. Kooi, but never followed through. Compl. ¶ 60.  Plaintiff claims that Dr. Wright never responded to plaintiff's letter. Compl. ¶ 62.

Even though plaintiff claims that his shoulder dislocated on May 5, 2004, the AHR shows that plaintiff next complained about his shoulder on July 12, 2004. (AHR at July 2, 2004).  Plaintiff does not cite the July 12,

2004 visit, instead, he alleges that he went to the Auburn Medical Unit on

August 16, 2004, and a nurse scheduled him for an appointment to see Dr.

Kooi. Compl. ¶ 63.  The AHR for July 12, 2004 indicates that a follow up

appointment was scheduled with Dr. Kooi.  *Id.*  In his complaint, plaintiff

states that "[a]t sometime before plaintiff was seen again by Dr. Kooi,

plaintiff somehow arranged to see another doctor at Auburn . . . named

Graceffo, who put plaintiff on a list to see an orthopedic doctor . . . . "

Compl. ¶ 64.  A document titled "Request and Report of Consultation"

shows that Dr. Anthony Graceffo referred plaintiff to an orthopedist on July

12, 2004.  Defs. Ex. B at p.39.

   Dr. Kooi examined plaintiff again on August 30, 2004.  (AHR at Aug.

30, 2004).  Plaintiff complained of "stiffness in his left shoulder from an old

injury."  Kooi Decl. at ¶ 14; (AHR at Aug. 30, 2004).  Dr. Kooi noted that

plaintiff had already been referred to see an orthopedic specialist.  *Id.*  In

his Declaration, Dr. Kooi states

> [b]ased on the negative findings of dislocation or separation on
> plaintiff's x-ray, together with his normal range of motion on
> each physical examination by me, and plaintiff's ability to raise
> his arm above his head, it was my reasoned judgment and
> opinion that the plaintiff was not suffering from a dislocation or
> separation injury and, instead, was experiencing pain due to
> weakness in his left shoulder.  I therefore prescribed
> strengthening exercises for the plaintiff and followed the
> plaintiff's condition.

14

Kooi Decl. at ¶ 15.

Plaintiff claims that on August 30, 2004, Dr. Kooi simply told plaintiff to "do some exercise." Compl. ¶¶ 66-68.  On September 1, 2004, plaintiff was examined by a doctor at "Walsh RMU."  Defs. Ex. B at p.36.  After an orthopedic examination, the doctor prescribed physical therapy three times a week for six weeks.  *Id.*  Plaintiff participated in physical therapy at Five Points Correctional Facility beginning September 24, 2004 until November 1, 2004.  Defs. Ex. B at 26-35.  Plaintiff states that the physical therapy did not work. Compl. ¶ 69.

It is unclear when plaintiff next complained about his left shoulder. The AHR shows a visit to the medical department on November 15, 2004. (AHR at Nov. 15, 2004).  The entry does not indicate that plaintiff complained about his shoulder. *Id.*  The first two lines of the entry are mostly illegible except for the word "Theraband."  *Id.*  In his deposition, plaintiff described Therabands as "strong elastic band[s]" that were used in his physical therapy sessions. (T. at 62).  Dr. Dwight Webster examined plaintiff on December 7, 2004, and on that date, plaintiff consented to surgery for the purpose repairing his "dislocating L shoulder."  Defs. Ex. B at 19-20.  The medical records show that plaintiff had surgery on his left shoulder on February 2, 2005.  Defs. Ex. B at 6-7.

Plaintiff's complaint contains four causes of action.  All the causes of action allege violations of plaintiff's right to be free from cruel and unusual punishment, caused by the defendants' deliberate indifference to plaintiff's serious medical needs.  Compl. at pp. 13-14.  Plaintiff's third and fourth causes of action also allege equal protection and due process violations.[7]

## 3.   **Personal Involvement**

It is well-settled that in order to be held liable for damages in a section 1983 action a defendant must have been personally involved in the alleged violation.  *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087 (1978).  The doctrine of respondeat superior is inapplicable to section 1983 claims.  *Polk County v. Dodson*, 454 U.S. 312, 325 (1981); *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973), *cert. denied*, 414 U.S. 1033 (1973).

In *Williams v. Smith*, the Second Circuit detailed the various ways in which a defendant can be personally involved, and thus be subject to individual liability, in a constitutional deprivation.  *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986).  A supervisory official is said to have been

---

[7] Although plaintiff's causes of action raise "equal protection" and "due process" violations, it is unclear to what plaintiff is referring.  In order to state an equal protection violation plaintiff would have to be claiming that he was treated differently than other similarly situated individuals. Plaintiff makes no such claim, thus, any equal protection claim may be dismissed. Plaintiff may be referring to "substantive due process" in the nature of his Eighth and Fourteenth Amendment claims for denial of constitutionally adequate medical care.

personally involved if that official directly participated in the infraction. *Id.*
A supervisory official is said to have been personally involved if, after
learning of a violation through a report or appeal, he or she failed to
remedy the wrong. *Id.* Personal involvement of a supervisory official is
said to exist if he or she created a policy or custom under which
unconstitutional practices occurred or allowed such a policy or custom to
continue. *Id.* Finally, a supervisory official may be personally involved if he
or she were grossly negligent in managing subordinates who caused the
unlawful condition or event. *Id.*

Defendants argue that defendant Dr. Lester Wright was not
personally involved in plaintiff's alleged violations. Defs, Mem. of Law at 8
(Dkt. No. 39). Dr. Wright was the Deputy Commissioner and Chief Medical
Officer of DOCS. Wright Decl. ¶ 1. Plaintiff's only claim against Dr. Wright
is that Dr. Wright failed to respond to plaintiff's letter and failed to rectify the
allegedly inadequate care plaintiff received at Auburn Correctional Facility.
Compl. at ¶ 62. Plaintiff cites no other involvement by this defendant.

In his declaration, Dr. Wright states that his office's normal business
practice is to assign the investigation of alleged violations to a member of
his staff. Wright Decl. at ¶ 6 (Dkt. No. 39). "A member of my staff learned
that plaintiff had filed a grievance in connection with the issues discussed

17

in his May 30, 2004 letter to me, and that the plaintiff had been examined by a physician at his facility. . . The matter was then closed in my office" *Id.* at     ¶ 7-8.  Defendant Wright states that he did not see plaintiff's letter. Wright Decl. ¶ 6.

Defendants' Exhibit D is a form-note from Dr. Wright to "Hally"[8] in which Dr. Wright requested this individual to "[i]nvestigate and respond on my behalf."  The note indicates that the matter was "[i]nvestigated and closed . . . ." Defs. Ex. D.  The comments state that the "inmate has filed a grievance - he has been evaluated by Dr. Kooi." *Id.*  It is now well-settled that the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement. *Smart v. Goord*, 441 F. Supp. 2d 631, 642-643 (S.D.N.Y. 2006).  The same is true if the only involvement of the supervisory official is to refer the inmate's complaint to the appropriate staff for investigation. *Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs.*, 491 F. Supp. 2d 342, 347 (W.D.N.Y. 2007).

Dr. Wright was not directly involved in plaintiff's care and did not examine plaintiff.  It is clear that plaintiff's letter was referred to a subordinate for investigation.  Clearly, plaintiff had also filed a grievance

---

[8] The name on this note is difficult to read.  The person's name to whom the investigation was referred could be "Hally" or "Holly."

that was also being investigated.  Thus, the investigation by defendant

Wright's subordinate was closed.  This does not constitute personal

involvement by defendant Wright, and the case may be dismissed as to

this defendant.

### 4.   <u>Medical Care</u>

In order to state an Eighth Amendment claim based on

constitutionally inadequate medical treatment, the plaintiff must allege "acts

or omissions sufficiently harmful to evidence deliberate indifference to

serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

There are two elements to the deliberate indifference standard.  *Smith v.*

*Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).  The first element is

**objective** and measures the severity of the deprivation, while the second

element is **subjective** and ensures that the defendant acted with a

sufficiently culpable state of mind.  *Id.* at 184 (citing *inter alia Chance v.*

*Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

In order to meet the first element of the standard, plaintiff must show

that he has a sufficiently serious illness or injury.  *Id.* (citing *Hudson v.*

*McMillian*, 503 U.S. 1, 9 (1992).  A medical condition has been considered

"sufficiently serious" when there is a "condition of urgency," one that may

result in death, degeneration, or extreme pain.  *Hathaway v. Coughlin*, 99

F.3d 550, 553 (2d Cir. 1996).  The seriousness of a plaintiff's medical need

may also be determined by reference to the effect of denying the particular

treatment.  *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151

F. Supp. 2d 303, 310 (S.D.N.Y. 2001)(citation omitted).  Thus, if

unnecessary and wanton infliction of pain results from the denial of

treatment, or if the denial of treatment causes the inmate to suffer a lifelong

handicap or permanent loss, the condition may be considered "sufficiently

serious."  *Id.* (citing *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000)).

    In this case, defendants argue that plaintiff's shoulder injury does not

constitute a serious medical need. Defs. Mem. of Law at 3-6 (Dkt. No. 39).

There is, however, no "metric guide" for the court to determine whether a

plaintiff has a sufficiently serious medical condition. *Brock v. Wright*, 315

F.3d 158, 162 (2d Cir. 2003).  In *Chance v. Armstrong*, 143 F. 3d 698,

702-703 (2d Cir. 1998), the Second Circuit set forth some guidelines for

this determination. *Id.* (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60

(9th Cir. 1992)).  These considerations include (1) whether a reasonable

doctor or patient would perceive the medical need in question as "important

or worthy of comment or treatment," (2) whether the medical condition

significantly affects daily activities, and (3) "the existence of chronic and

substantial pain". *Id.*

20

This court is hesitant to hold as a matter of law that a shoulder injury is simply not a serious medical need, particularly based upon the third consideration listed above, the existence of chronic and substantial pain.  It has been held that allegations of "severe pain . . . [and] reduced mobility . . ." in the shoulder are sufficient to raise a material issue of fact as to a serious medical need.  *Sereika v. Patel*, 411 F. Supp. 2d 397, 406 (S.D.N.Y. 2006).  In *Guarneri v. Bates, et al.*, this court adopted Magistrate Judge David Homer's recommendation, finding sufficient issues of material fact as to the actual pain and severity of the plaintiff's shoulder injury.  *Guarneri v. Bates, et al.*, 9:05-CV-444 (GLS/DRH), 2008 U.S. Dist. LEXIS 18281, *3–4 (N.D.N.Y. March 10, 2008).

In *Guarneri*, the plaintiff's shoulder was injured during an arrest, and the plaintiff complained for approximately one year about severe pain in his shoulder and an inability to move his arm before he was seen by an orthopedic specialist. *Guarneri v. Bates, et al.*, 9:05-CV-444 (Report-Recommendation) at 2-3 (Dkt. No. 86).  Even though the plaintiff in *Guarneri* was able to continue the activities of daily living, including playing "rough basketball" and "punching lights and walls with his injured arm," Judge Homer found sufficient issues of material fact as to the actual pain and severity of the plaintiff's shoulder injury. *Id.* at 11.

21

In *Benjamin v. Galeno*, 415 F. Supp. 2d 254, 259 (S.D.N.Y. 2005),[9] the court held that although there was no proof in the record that the plaintiff's rotator cuff injury was a serious medical condition, plaintiff's claim that he was suffering extreme pain was sufficient to raise a question of fact, "albeit a tenuous one," as to the objective prong of the Eighth Amendment analysis.  A careful reading of these cases shows that generally, the court will bypass the difficult determination of whether a plaintiff has a serious medical need, and will instead consider the second prong of the analysis to determine whether the defendants have shown "deliberate indifference." *See e.g. Sereika v. Patel*, 411 F. Supp. 2d at 407-409 (dismissing the inadequate treatment claim after finding that plaintiff had demonstrated a serious medical need); *Guarneri v. Bates*, 9:05-CV-444 (Report-Rec. at 11)(finding no evidence of deliberate indifference to shoulder injury, even though there was a question of fact regarding the seriousness of the injury).

In this case, plaintiff injured his shoulder long before the defendants were ever involved in his care, and years went by before he began requesting medical care for his injury.  Plaintiff testified that his injury

---

[9] This case, together with other related cases, was affirmed by the Second Circuit. *Benjamin v. Koeningsman*, 204 Fed. Appx. 979 (2d Cir. 2006).

occurred in 1994. (T. at 7-8).  According to plaintiff, between 1994 and 1998, his shoulder dislocated as often as once a year. (T. at 11-12). Plaintiff claims that from 1998 until plaintiff sought treatment in Attica Correctional Facility in 2002, plaintiff's shoulder dislocated another three or four times. (T. at 12-13).  Plaintiff states that during the time that the shoulder was actually dislocated, the pain was "excruciating, like real throbbing.  It hurt, real severe." (T. at 9).  Plaintiff testified that the shoulder always relocated itself, and that it took a few minutes for the shoulder to move back to the proper position. (T. at 14).

Oddly enough, the medical records show that plaintiff complained about his shoulder to the two John Doe defendants in Attica in January and February of 2002.  However, plaintiff **never** mentioned his shoulder again despite many medical examinations between 2002 and 2003.  In fact, the records show that when plaintiff was transferred to Upstate Correctional Facility in June of 2002, plaintiff denied any "chronic medical problems" and had no "current medical complaints." Defs. Ex. B at pp.57-59.

Plaintiff does claim, however, that when the shoulder dislocated, the pain was "excruciating."  Additionally, the records show that beginning in 2003, plaintiff did complain about his shoulder regularly.  Thus, for purposes of this order, the court will find that there is a question of fact

23

regarding the seriousness of plaintiff's medical condition, but will proceed to consider the second element of the standard.

In order to meet the second element, plaintiff must demonstrate more than an "inadvertent" or negligent failure to provide adequate medical care. *Id.* (citing *Estelle*, 429 U.S. at 105-106). Instead, plaintiff must show that the defendants were "deliberately indifferent" to that serious medical condition. *Id.* In order to rise to the level of deliberate indifference, the defendants must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance*, 143 F.3d at 702). The defendants must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must draw that inference. *Chance*, 143 F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

Disagreement with prescribed treatment does ***not*** rise to the level of a constitutional claim. *Sonds*, 151 F. Supp. 2d at 311. Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does ***not*** have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention

24

he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle*, 429 U.S. at 107).  Even if those medical judgments amount to negligence or malpractice, malpractice does ***not*** become a constitutional violation simply because the plaintiff is an inmate. *Id.  See also Daniels v. Williams*, 474 U.S. 327, 332 (1986)(negligence not actionable under Section 1983).  Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

In this case, plaintiff argues that his eventual surgery on his left shoulder in February 2005 shows that he had a serious medical need, and that medical professionals were indifferent to that serious medical need up until the point that the surgery was ordered. (Dkt. No. 43, 3).  None of the defendants in this case came into contact with plaintiff until 2002, and the named defendants at Auburn Correctional facility never met the plaintiff until late 2003.

The medical records show that after plaintiff began experiencing problems with his shoulder in 2003, and he was being examined in the Medical Department at Auburn, the providers never noticed any dislocation.

25

*See, generally* Defs. Ex. B.  By the time plaintiff was examined, there was no dislocation, and plaintiff was observed to have the full range of motion. (AHR at Dec. 3, 2003; Feb. 2, 2004; May 4, 2004; Nov. 30, 2004).

In the months from plaintiff's transfer to Auburn Correctional Facility in March or April 2003 and the surgery in February 2005, plaintiff was given medication, assigned strengthening exercises, and prescribed physical therapy.  Plaintiff visited the Medical Department on many occasions in 2003 and 2004 when he did not complain about his shoulder at all.  Plaintiff names two defendants who actually participated in his medical care: Nurse Androsko and Dr. Kooi.

Plaintiff's complaint about Nurse Androsko basically is that she was rude and verbally abusive to him, and called him a "baby." (T. at 28). Plaintiff states that he first saw defendant Androsko on November 20, 2003.  At plaintiff's deposition he stated that when he first saw Nurse Androsko, plaintiff already had an appointment to see Dr. Kooi. (T. at 36). Plaintiff told defendant Androsko about his shoulder, but was also complaining of acne. (AHR Nov. 20, 2003).  It is unclear what plaintiff claims that Nurse Androsko should have done at this time.  Plaintiff conceded at his deposition that his shoulder was ***not*** dislocated when he saw defendant Androsko. (T. at 29).  Plaintiff saw the doctor on December

3, 2003. (AHR Dec. 3, 2003).

Plaintiff saw defendant Androsko again on December 23, 2003 and
January 2, 2004. Compl. ¶¶ 30-38.  The AHR confirms these dates.
Although again, plaintiff states that this defendant was rude to him, he also
stated that his shoulder was ***not*** dislocated when he saw her. (T. at 35-36).
During the deposition, plaintiff stated that defendant Androsko told him that
she was not going to rush to get him x-rays (T. at 35), however, the AHR
indicates that plaintiff wanted the x-rays done "immediately," and that
defendant Androsko told plaintiff that the x-rays were ordered, and that
they would be done "when the tech has it scheduled." (AHR Dec. 23,
2003).  On January 2, 4004, plaintiff saw defendant Androsko and asked to
see the doctor. (AHR Jan. 2, 2004).  Defendant put plaintiff on the doctor's
list. *Id.* Plaintiff also claims that she refused to give him pain medication,
telling him to ask Dr. Kooi. (T. at 37). These are the only allegations against
this defendant.  Plaintiff had his x-rays on January 20, 2004. Def. Ex. B at
p.44.

Plaintiff complains that Dr. Kooi did not treat plaintiff properly, and
told plaintiff that he should exercise more.  Plaintiff claims that the
exercises that Dr. Kooi gave him did not work.  In his complaint, plaintiff
alleges that "several registered nurses" interpreted the x-rays and told

27

plaintiff that in "their professional judgment," he needed an MRI. Compl. ¶ 48. At his deposition, plaintiff admitted that it may have been *one* nurse that mentioned an MRI, and that plaintiff had "embellished" in the complaint. (T. at 48). The fact that plaintiff disagrees with the defendants' manner, medical judgments, or choices about treatment does not rise to the level of a constitutional violation. As stated above, disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle*, 429 U.S. at 107). Dr. Kooi did suggest that plaintiff exercise more, however, Dr. Webster also told plaintiff that he had to strengthen his muscles. (T. at 61). In fact, after plaintiff was referred to specialists, they did not initially discuss surgery with plaintiff. (T. at 61). Plaintiff was initially prescribed physical therapy. (T. at 62). Plaintiff participated in physical therapy two to three times per week for two to three months. (T. at 62). It was only after the physical therapy did not work, that Dr. Webster told plaintiff that the decision to have surgery was "up to him." (T. 64-65).

Even if Dr. Kooi's and Nurse Androsko's examinations and treatment of plaintiff's shoulder amounted to negligence or malpractice, malpractice does ***not*** become a constitutional violation simply because the plaintiff is

an inmate. *Sonds, supra. See also Daniels*, 474 U.S. at 332.  The fact that

surgery was ordered on plaintiff's shoulder at some later date simply does

not show that the care that plaintiff received until then was constitutionally

inadequate.  Plaintiff also testified at his deposition that while he was at

Auburn, he never had problems obtaining sick-call visits, and he was

always able to see "somebody."  (T. at 72-73).  It was the alleged "quality"

of the care that plaintiff did not like.  Plaintiff's allegations, even if they

amount to malpractice do not rise to the level of a constitutional violation.

Even assuming that plaintiff had a serious medical need, plaintiff's multiple

visits to and treatments given by the Medical Department at Auburn

Correctional Facility do not constitute deliberate indifference to his serious

medical needs.

The motion for summary judgment will be granted, and the complaint

dismissed as to defendants Nurse Androsko and Dr. Kooi.

## 5.   __Service of Process__

Rule 4 of the Federal Rules of Civil Procedure requires that service of

process be made within 120 days after the complaint is filed. FED. R. CIV. P.

4(m).  If service is not effected, the court "must dismiss the action without

prejudice against that defendant or order that service be made within a

specified time." *Id.*  When plaintiff is proceeding *pro se* and *in forma*

*pauperis*, he is entitled to rely on the U.S. Marshal to serve process. *Romandette v. Wheetabix*, 807 F.2d 309 (2d Cir. 1986). *See also* 28 U.S.C. § 1915(d); LOCAL RULES N.D.N.Y. 5.1(g).

Plaintiff filed this action in January 2006, and was notified by order of this court that he should "take reasonable steps to identify the John Doe defendants, including discovery requests served on the named defendants in accordance with the Federal Rules of Civil Procedure." (Dkt. No. 6).  In his complaint, plaintiff described both John Does as medical personnel at Attica Correctional Facility. Compl. at ¶¶ 6-7.  At plaintiff's deposition in October 2007, plaintiff testified that he had identified both John Does. (T. at 16-17).  However, plaintiff has made no effort to request service on these individuals, and the 120 days has long since passed.

Generally, the court would dismiss the action without prejudice for failure to serve, however, a review of the claims against these individuals, together with the dates of their alleged actions shows that the complaint should be dismissed with prejudice against these defendants.  In his complaint, plaintiff alleges that he saw John Doe # 1 at Attica[10] Correctional Facility on January 25, 2002, and he saw John Doe # 2 at Attica

---

[10] Attica is in the Western District of New York.  This could raise some venue issues that are not necessary for this court to discuss.

Correctional Facility on February 4, 2002. Compl. ¶¶ 14-18.  The only

allegations against these individuals are that John Doe # 1 told plaintiff that

his shoulder was not dislocated after making plaintiff raise his arm, and

John Doe # 2 told plaintiff that there was nothing wrong with his shoulder,

but that John Doe would "get back to" plaintiff if there was anything he

could do. *Id.*

Plaintiff did not see these individuals again or complain about his

shoulder until August of ***2003***.  The complaint does not state a claim as

against these two individuals.  To the extent that plaintiff alleges that they

did not treat him properly, he does not state a claim for deliberate

indifference.[11]  This is particularly so because the court has found that

plaintiff's Eighth Amendment claims must fail as against all of the

defendants, based on plaintiff's medical records and his own testimony.

Thus, the court will dismiss this action with prejudice as against the John

---

[11] The court would also point out that there is also a possible statute of limitations issue. The Attica John Does examined plaintiff in January and February of 2002.  Plaintiff filed this action on January 18, 2006 (the date the complaint was postmarked) (Dkt. No. 1). The statute of limitations for section 1983 actions is ***three*** years in New York State. *Weir v. City of New York*, 05 Civ. 9268, 2008 U.S. Dist. LEXIS 61542, *27 (S.D.N.Y. Aug. 11, 2008)(citing *inter alia Owens v. Okure*, 488 U.S. 235, 249-50 (1989); N.Y. Civ. Prac. L. & R.§ 214(5); *Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002)).  The accrual of a cause of action is governed by federal law, which provides that a claim accrues when the plaintiff knows or has reason to know of the harm upon which his action is based. *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994).  Although this court will not engage in a lengthy analysis of the statute of limitations in this case, the court would simply point out that in addition to plaintiff's lack of a claim for deliberate indifference, there would also be a statute of limitations issue.

Doe defendants.[12]

Nurse Administrator Robertson has also not been served in this

action.  On July 20, 2006, the U.S. Marshal filed a "Process Receipt and

Return" form indicating that defendant Robertson had not been served

because he was no longer employed by DOCS. (Dkt. No. 10).  Plaintiff was

apparently aware that defendant Robertson no longer worked for DOCS

because on the same form, in a section titled "Special Instructions or Other

Information that Will Assist in Expediting Service," plaintiff stated that he

was "told" that defendant Robertson no longer worked at Auburn. *Id.*

Plaintiff then stated that the defendant's "previous employer" at Auburn

would have defendant Robertson's forwarding address. *Id.*  The docket

sheet in this action does not show any further attempts at serving

defendant Robertson.  Again, normally, the court would either dismiss the

action without prejudice or give plaintiff some extra time to serve this

defendant, however, as with the John Doe defendants, this court finds that

plaintiff does not state a claim against defendant Robertson.

Defendant Robertson was the Nurse Administrator at Auburn

Correctional Facility.  The only claims that plaintiff makes against this

---

[12] When a plaintiff is proceeding *in forma pauperis*, the court may dismiss the claim or claims at any time that the court determines *inter alia* that plaintiff does not state a claim for relief. 28 U.S.C. § 1915(e)(2)(B)(2).

defendant is that plaintiff complained to defendant Robertson "on numerous occasions" when he saw this defendant in the Medical Unit. Compl. ¶ 60.  Plaintiff claims that defendant Robertson told plaintiff that he would speak with Dr. Kooi, but Robertson never spoke to Dr. Kooi or assisted plaintiff in solving his problem. Compl. ¶ 61.

Nurse Administrator Robertson is a supervisory official, and like defendant Wright, would not be responsible for failing to investigate plaintiff's problems. *Smart v. Goord*, 441 F. Supp. 2d at 642-43.  Plaintiff does not claim that defendant Robertson was his medical provider or that he had any other involvement with plaintiff's medical care.  The fact that plaintiff saw the Nurse Administrator a few times in the medical unit and mentioned his problems is not a sufficient statement of the personal involvement of this defendant.  Thus, the court will dismiss the action with prejudice as against Nurse Administrator Robertson for failure to serve and under 28 U.S.C. § 1915(e)(2)(B)(ii).

**WHEREFORE,** based on the findings above, it is hereby

**ORDERED**, that defendants' motion for summary judgment (Dkt. No. 39) is **GRANTED**, and it is further

**ORDERED**, that the case against **JOHN DOE # 1, JOHN DOE # 2 and DEFENDANT N.A. ROBERTSON** is **DISMISSED WITH PREJUDICE**

for failure to serve and pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), and the

complaint is **DISMISSED IN ITS ENTIRETY**.

      **It is so ordered.**

September 30, 2008
Albany, New York

                                 Gary L. Sharpe
                                 U.S. District Judge